**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim. Action No. 07-613 (SDW) |
| Plaintiff, | |
| v. | **OPINION** |
| TYSHAUN ST. VALLIER, | |
| Defendant. | February 23, 2021 |

**WIGENTON,** District Judge.

Before this Court is Defendant Tyshaun St. Vallier's ("Defendant") Motion for Compassionate Release under the First Step Act, 18 U.S.C. § 3582(c)(1)(A). This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, having considered the parties' submissions, Defendant's Motion for Compassionate release is **DENIED**. However, this Court recommends to the Bureau of Prisons ("BOP") that Defendant be placed on home confinement for the remainder of his sentence.

**I.    BACKGROUND AND PROCEDURAL HISTORY**

Defendant was arrested on or about May 6, 2007, for smuggling cocaine into the United States from Trinidad. (D.E. 224 at 2; D.E. 17 at 1.) A grand jury charged Defendant with importation and conspiracy to import 500 or more grams of cocaine into the United States in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 952(a), 960(b)(2), and 963. (D.E. 17.) Oral argument on pretrial motions was scheduled for July 21, 2008, and trial was set to begin on July 29, 2008. (D.E. 37-1 ¶ 5.)

1

Approximately one week before trial and while Defendant was on bail, he removed his electronic monitoring ankle device and absconded. (*Id.* ¶¶ 4–6; D.E. 224 at 2; D.E. 132 ("Sent. Tr.") at 21:6–7.) Around the same time, Defendant plotted the murder of a family friend and co-conspirator who was expected to testify against Defendant at trial. (D.E. 224 at 2; *see* Sent. Tr. at 33:19–20:17; 59:1–8.) On or about October 3, 2008, Defendant was located and arrested in the District of Maryland. (*See* D.E. 43.) He was subsequently charged with and pled guilty to a Third Count for failure to appear in violation of 18 U.S.C. §§ 3146(a)(1) and (b)(1)(A)(i). (D.E. 60 at 3; D.E. 86; D.E. 87; D.E. 223 at 21.) On April 28, 2009, a jury found Defendant guilty of knowingly and intentionally importing and conspiring to import 500 or more grams of cocaine into the United States under Counts One and Two. (D.E. 104.)

On August 3, 2009, this Court sentenced Defendant to 204 months of imprisonment comprised of 188 months for Counts One and Two to run concurrently, and 16 months for Count Three to run consecutively.[1] (D.E. 125; Sent. Tr. at 69:17–23.) The judgment also included five years of supervised release upon Defendant's release from imprisonment. (D.E. 125 at 3; Sent. Tr. at 69:24–25.) On appeal, the Third Circuit upheld the judgment of conviction, but vacated Defendant's sentence and remanded to this Court for resentencing with a revised criminal history category.[2] *United States v. St. Vallier*, 404 F. App'x 651, 664–65 (3d Cir. 2010). On remand in

---

[1] Under the existing U.S. Sentencing Guidelines ("Guidelines") range, Defendant faced between 151- and 188-months' imprisonment based on a criminal offense level of thirty and a criminal history category of five. (D.E. 223 at 22.) However, this Court varied upward, adding two offense level points, based on Defendant's flight before trial and involvement in a witness murder plot. (Sent. Tr. 67:7–68:24.) Thus, the Guidelines range at Defendant's initial sentencing, inclusive of the upward variance, fell between 188 and 235 months. (D.E. 223 at 22.)

[2] In imposing sentence, this Court relied on information contained in Defendant's Presentence Report ("PSR"), including ten prior arrests and four prior convictions. (Sent. Tr. 65:7–9.) Because counsel provided no documentation regarding the status of a prior state court sentence, this Court considered the prior sentence as represented in the PSR. (Sent. Tr. 59:16–60:11.) On appeal, the Government confirmed that the prior state court sentence at issue had been suspended. *See St. Vallier*, 404 F. App'x 651 at 665. Because three criminal history points were assessed against Defendant in light of the PSR's error, his criminal history category was lowered during resentencing by one point from five to four. *See id.* at 665 n.14; (D.E. 145 at 17:7–13; 19:9–11.)

2

2011, this Court resentenced Defendant to the same term—204 months' imprisonment—notwithstanding Defendant's lower criminal history category, because it found no basis to depart from the upward variance previously applied.[3]  (D.E. 145 at 18:15–20:21.)  Thereafter, on February 6, 2017, Defendant's motion for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(2) and Amendment 782 to the Guidelines was denied.  (D.E. 210; D.E. 213.)

Defendant is currently serving his sentence at the United States Penitentiary, Lewisburg ("USP Lewisburg") in Pennsylvania.[4]  BOP, Find An Inmate (Feb. 22, 2021, 9:00 A.M.), www.bop.gov/inmateloc/.  Defendant has served approximately 84% or 148 months of his sentence and is projected to be released on March 6, 2023.  *See id.*; (D.E. 223 at 23; App. at 150–51.)  Furthermore, Defendant is eligible for home detention on September 6, 2022.  (D.E. 223 at 17 (citing App. at 146).)  Since entering the BOP's custody in October 2009, Defendant has garnered several personal and professional accomplishments which are further described in Section III.B of this Opinion.

Defendant filed the instant Motion for Compassionate Release on January 6, 2021 (D.E. 223); the Government opposed on February 10, 2021 (D.E. 224); and Defendant replied on February 17, 2021 (D.E. 225).[5]  Defendant argues that "extraordinary and compelling reasons" warrant his release under the FSA because he has heart issues, is overweight, and recently

---

[3] In 2011, Defendant faced resentencing between 135- and 168-months' imprisonment based on an offense level of thirty and a revised criminal history category of four.  (D.E. 145 at 15:5–7.)  However, after varying Defendant's criminal offense level upward by two points, the Guidelines range fell between 168 and 210 months.  (*Id.* at 15:7–11.)

[4] Although the Government represents that USP Lewisburg is a "high-security prison" (D.E. 224 at 2), the facility's website states that it is a "medium security" penitentiary that has "an adjacent minimum security satellite camp." BOP, USP Lewisburg (Feb. 22, 2021, 9:00 A.M.), https://www.bop.gov/locations/institutions/lew/.  As maintained by Defendant, it appears that he is currently serving his sentence at the minimum-security satellite facility, Lewisburg Camp.  (D.E. 223 at 8; D.E. 225 at 1 (citing App. at 146 (noting Defendant's unit as "LEC" in November 2020)).)

[5] On or about June 24, 2020, USP Lewisburg Warden Radm S. Spaulding denied Defendant's June 12, 2020 request for early release to home confinement.  (Exs. A & B to D.E. 224.)  Accordingly, it is undisputed that Defendant exhausted his administrative remedies because more than thirty days have passed since Defendant's request to the BOP.  *See, e.g.*, *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); (D.E. 224 at 4–5.)

contracted COVID-19. (D.E. 223 at 3–17.) These claimed comorbidities allegedly place Defendant at high risk of severe illness, death, or further debilitating consequences should he become reinfected with the virus. (*Id.*) In addition, Defendant avers that the sentencing factors weigh in his favor given, among other reasons, his exemplary record over twelve years of incarceration.[6] (*Id.* at 17–25.)

## II. LEGAL STANDARD

Although a district court generally has limited authority to modify a federally-imposed sentence once it commences, *see United States v. Epstein*, Crim. No. 14-287, 2020 WL 1808616, at *2 (D.N.J. Apr. 9, 2020); *see also Dillon v. United States*, 560 U.S. 817, 825 (2010), the First Step Act ("FSA"), 18 U.S.C. § 3582(c)(1)(A)(i), permits district courts to grant compassionate release where there exist "extraordinary and compelling reasons" to reduce a sentence. The statute provides, in relevant part, that:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c). Accordingly, under the FSA, "a defendant seeking a reduction in his term of imprisonment bears the burden of establishing both that he has satisfied 1) the procedural

---

[6] While Defendant does not include a request for home confinement in his motion for compassionate release, this Court finds that the present circumstance warrants a recommendation to the BOP.

4

prerequisites for judicial review, and 2) that compelling and extraordinary reasons exist to justify compassionate release." *Epstein*, 2020 WL 1808616, at *2. First, "a defendant seeking a reduced sentence must ask the BOP to do so on his or her behalf," and either "wait thirty days for the BOP to respond" or "exhaust all available administrative appeals after receiving an adverse decision." *United States v. McDonald*, Crim. No. 09-556, 2020 WL 3638280, at *3 (D.N.J. July 2, 2020) (citing *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020)). Then, a court may reduce an inmate's sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) "if the court finds that (1) extraordinary and compelling reasons warrant a reduction, (2) the reduction would be consistent with applicable policy statements issued by the Sentencing Commission, and (3) the applicable sentencing factors under § 3553(a) ["Section 3553(a)"] warrant a reduction."[7] *United States v. Sparrow*, Crim. No. 18-653, 2020 WL 4364328, at *2 (D.N.J. July 30, 2020) (internal quotations omitted).

### III. DISCUSSION

#### A. Compassionate Release

This Court finds that Defendant's alleged comorbidities do not constitute a "compelling and extraordinary reason" to justify his release under the FSA. *See Epstein*, 2020 WL 1808616, at *2. First, Defendant avers that he has heart problems such as intermittent chest pains and an irregular heartbeat. (D.E. 223 at 3–5.) Defendant concedes, however, that he has no confirmed heart-related diagnosis from medical professionals, including those listed by the Centers for Disease Control and Prevention ("CDC") that increase the risk of serious illness from the virus

---

[7] The Sentencing Commission's relevant policy statement identifies medical conditions that meet the "extraordinary and compelling" requirement as those where the defendant is (i) suffering from a terminal illness, or (ii) suffering from a serious physical or medical condition, serious functional or cognitive impairment, or deteriorating physical or mental health because of the aging process, "that substantially diminishes the ability of the defendant to provide selfcare within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A).

5

that causes COVID-19.[8] (*Id.*) Instead, Defendant notes that he was prescribed medication to treat vertigo, and medical records reflect that Defendant was instructed to decrease his caffeine intake to help curb his symptoms. (*Id.* at 4; D.E. 224 at 6 (citing Ex. C to D.E. 224 at 9, 18–20).)

Courts are reluctant to grant compassionate release based on generalized symptoms that do not correlate to medical diagnoses known by the CDC to increase the risk of serious illness from COVID-19. *See e.g.*, *United States v. Carazolez*, Crim. No. 18-081, 2020 WL 5406161, at *4 (D.N.J. Sept. 9, 2020) (stating that "general allegations of medical condition[s], without the necessary specificity, are insufficient to establish the rare circumstances that would justify a grant of compassionate release") (internal quotations omitted); *see also United States v. Mason*, Crim. No. 17-191, 2020 WL 6521050, at *1 (D.N.J. Nov. 5, 2020) (denying motion for compassionate release where defendant had no evidence of a confirmed asthma diagnosis); *United States v. Falci*, Crim. No. 17-228, 2020 WL 3410914, at *4 (D.N.J. June 22, 2020) (denying compassionate release where the defendant had hypertension because "[t]here [was] no indication that [d]efendant suffer[ed] from pulmonary hypertension or any other 'serious heart condition' that the CDC has identified as a high-risk factor."). Moreover, Defendant sought and received medical evaluations to address his heart-related symptoms which admittedly subsided "[e]ach time [Defendant] was seen" by medical personnel.[9] (D.E. 223 at 3–5.) Accordingly, Defendant's purported heart issues do not warrant release under the FSA.

Next, Defendant avers that his weight, specifically his Body Mass Index ("BMI") of 29.99,

---

[8] These specific heart conditions include heart failure, coronary artery disease, cardiomyopathies, and pulmonary hypertension. *See* CDC, *People With Certain Medical Conditions* (Feb. 22, 2021, 9:00 A.M.), http://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions html.

[9] Although Defendant claims he has not had additional medical appointments at USP Lewisburg for his purported heart problems since October 2019 (D.E. 223 at 5), he does not point to any specific requests for medical attention that have gone unanswered. (*See generally* D.E. 223; D.E. 225; *see also* App. at 76 (reflecting that Defendant "was a no show" for a medical appointment on November 23, 2020); *id.* at 77 (stating that Defendant was a "[n]o [s]how" on September 30, 2020, for a sick call regarding purported "palpitations").)

6

places him at an increased risk of severe illness from COVID-19.  (D.E. 223 at 5–7.)  The CDC states that "overweight" individuals with a BMI higher than 25 but lower than 30 "*might*" have an increased risk of severe illness from COVID-19.  *See* CDC, *People With Certain Medical Conditions* (Feb. 22, 2021, 9:00 A.M.), http://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (emphasis added).  "Obesity" increases an individual's risk of severe illness from COVID-19 and is defined by a BMI between 30 and lower than 40.  *Id.*  Courts have denied motions for compassionate release where defendants present higher BMIs when there is no apparent inability to lose weight, insufficient health care, or a demonstrated inability to provide self-care.  *See, e.g.*, *United States v. Dunich-Kolb*, Crim. No. 14-150, 2020 WL 6537386, at *6 (D.N.J. Nov. 5, 2020) (deny release where defendant had a BMI of 27.7) (citing *United States v. Cherry*, Crim. No. 09-715, 2020 WL 5868800, at *2 (D.N.J. Oct. 2, 2020) (denying release where defendant had a BMI between 30 and 33)); *United States v. Bleicher*, Crim. No. 19-99, 2020 WL 2744606, at *3 (D.N.J. May 27, 2020) (denying compassionate release for a defendant with a BMI of 37.7).  Here, there is no evidence that Defendant is under insufficient medical care, that he cannot lose weight, or that he is unable to provide self-care.  (*See generally* D.E. 223.)  Thus, Defendant's marginal obesity is not an "extraordinary and compelling reason" to justify his release.

Defendant also contends that because he already contracted COVID-19, he remains susceptible to reinfection and "imminent or long-term harm" from having had the virus.  (D.E. 223 at 8–17.)  In support of his request, Defendant cites to at least four instances where inmates tested positive for COVID-19, recovered, and subsequently died.  (*Id.* at 11–13.)  Unlike the Defendant, at least three of those instances involved inmates who had long-term and/or pre-existing medical conditions that the CDC listed as risk factors for developing severe illness from COVID-19.  (D.E.

7

223 at 12–13.) In addition, a prior COVID-19 infection likely cuts against compassionate release because while reinfection rates are not entirely understood, the CDC states that "cases of reinfection with COVID-19 have been reported but remain rare." CDC, *Reinfection with COVID-19* (Feb. 22, 2021, 9:00 A.M.), https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html; *see United States v. Johnson*, Crim. No. 19-0787, 2021 WL 165103, at *4 n.10 (D.N.J. Jan. 19, 2021).

Here, it is undisputed that Defendant tested positive for COVID-19 on or about December 11, 2020 and was released from isolation on December 22, 2020, after reporting no symptoms for five consecutive days. (*Id.* at 8; App. at 19, 62–67.) Medical records indicate that Defendant received adequate health care when he was infected. For example, Defendant received daily medical evaluations, including temperature checks, from December 11, 2020 to December 21, 2020. (App. at 62–75.) In addition, Defendant was prescribed Tylenol for his reports of body aches. (*Id.* at 72.) Fortunately, despite Defendant's alleged comorbidities, it appears that he did not experience severe COVID-19 related symptoms, nor did Defendant require escalated medical care. (*Id.* at 62–72.) Undoubtedly, this Court is sympathetic to Defendant's concerns regarding possible reinfection and potential complications from having contracted COVID-19.[10] However, it appears that should Defendant test positive for COVID-19 in the future, USP Lewisburg is

---

[10] Although Defendant argues that he is at serious risk of severe illness or death should he recontract COVID-19, he refused the Moderna COVID-19 vaccine on January 27, 2021, in light of allegedly ongoing symptoms. (Ex. D to D.E. 224; D.E. 225 at 6); *see United States v. Porfirio Lobo*, Crim. No. 15-174-01, 2021 WL 603267, at *3–4 (S.D.N.Y. Feb. 12, 2021) (noting that the court's finding of no extraordinary or compelling reason for defendant's release was "bolstered by" his refusal of the Moderna COVID-19 vaccine "for unspecified reasons").

Defendant notes that his increased risk is compounded further because he is African American. (D.E. 223 at 7 (citing CDC, *Health Equity Considerations and Racial Ethnic Minority Groups* (Feb. 22, 2021, 9:00 A.M.), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html).) Consistent with sister courts in our district, Defendant's argument in this regard "does not help him establish an extraordinary and compelling reason for release." *See, e.g.*, *United States v. Bell*, Crim. No. 15-603, 2021 WL 303009, at *3 (D.N.J. Jan. 29, 2021) (collecting cases).

capable of monitoring and treating his symptoms. *See, e.g.*, *United States v. Bell*, Crim. No. 15-603, 2021 WL 303009, at *3 (D.N.J. Jan. 29, 2021) (denying motion for compassionate release where defendant contracted COVID-19 and required emergency-room attention for additional evaluation because the BOP facility was "indeed capable of caring for [defendant]"). As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 954 F.3d at 597.

For the reasons stated above, this Court is satisfied that extraordinary and compelling reasons do not exist to justify Defendant's release under the FSA. Accordingly, this Court need not assess the applicable sentencing factors under Section 3553(a). *See e.g.*, *Carazolez*, 2020 WL 5406161, at *3 n.3; *United States v. Urzua*, Crim. No. 16-312, 2020 WL 7586954, at *3 (D.N.J. Dec. 22, 2020); *see also United States v. Bradley*, Crim. No. 15-550, 2020 WL 7711408, at *2 (E.D. Pa. Dec. 29, 2020) (commending defendant's "engagement in prison programming" but noting that rehabilitation does not amount to an extraordinary and compelling reason for release) (citing 28 U.S.C. § 994(t)). However, as explained further below, this Court recommends to the BOP that Defendant be reconsidered for home confinement.

### B.  Home Confinement Recommendation

Pursuant to 18 U.S.C. § 3624(c)(2), the BOP may "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." 18 U.S.C. § 3624(c)(2). In response to the COVID-19 pandemic, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 12003(b)(2) ("Section 12003"), permits a limited expansion of this power, stating that "[d]uring the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the

Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement . . . ." CARES Act, § 12003(b)(2). In Spring 2020, pursuant to Section 12003, Attorney General Barr issued two memoranda expanding the BOP's power.[11]  Specifically, the BOP should consider home confinement under "the totality of circumstances for each individual inmate" using a list of "non-exhaustive" factors such as (i) the "security level" of the prison in which the inmate was held, with priority given to low and minimum-security facilities; (ii) the inmate's conduct while incarcerated, including any disciplinary record for violent conduct and BOP violations; (iii) the inmate's crime of conviction; and (iv) the inmate's verified plan of re-entry under conditions that present a lower risk of COVID-19 contraction.  *See* March 26, 2020 Mem.  The BOP has stated that it is prioritizing home confinement consideration for inmates who have served 50% or more of their sentences or 25% or more of their sentences with less than 18 months remaining.  *United States v. Romano*, Crim. No. 18-587, 2020 WL 4746553, at *3 (D.N.J. Aug. 17, 2020) (citing BOP correspondence); *see also Dunich-Kolb*, 2020 WL 6537386, at *12.  Although Defendant will be eligible for home confinement under 18 U.S.C. § 3624(c) in September 2022, he is presently eligible for consideration under the CARES Act and meets the BOP's prioritization criteria.  *See, e.g.*, *Romano*, 2020 WL 4746553, at *3.

Although the CARES Act did not grant the district court the authority to order home confinement, it may issue a recommendation of home confinement for the BOP's consideration. *United States v. Goldblatt*, Crim. No. 18-345, 2021 WL 287881, at *2–3 (D.N.J. Jan. 28, 2021).

---

[11] *See* Office of the Attorney General, *Prioritization of Home Confinement As Appropriate In Response To COVID-19 Pandemic* (March 26, 2020), https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf ("March 26, 2020 Mem."); Office of the Attorney General, *Increasing Use of Home Confinement at Institutions Most Affected By COVID-19* (April 3, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf.

Pursuant to 18 U.S.C. § 3621(b)(4), the BOP may consider "any statement" by the sentencing court that (i) "concern[s] the purposes for which the sentence to imprisonment was determined to be warranted," or (ii) "recommend[s] a type of penal or correctional facility as appropriate." 18 U.S.C. § 3621(b)(4); *see United States v. Saunders*, No. 20-2486, 2021 WL 420317, at *2 (7th Cir. Feb. 8, 2021) (stating that the district court "lacked authority to change [defendant's] place of imprisonment" because it "may only recommend a new placement; it may not order it"); *United States v. Ceballos*, 671 F.3d 852, 856 n.2 (9th Cir. 2011) (noting that "district courts [have] the authority to make (or not make) non-binding recommendations to the [BOP] at any time"). Indeed, "the BOP routinely relies on judicial recommendations that express the district judge's determination of how a defendant should serve his time." *United States v. Doshi*, Crim. No. 13-20349, 2020 WL 1527186, at *1 (E.D. Mich. Mar. 31, 2020) (granting motion for judicial recommendation to home confinement where defendant "present[ed] a *de minimis* risk of recidivism").

Here, the BOP issued a conclusory denial of Defendant's June 2020 request for home confinement nearly eight months ago, on or about June 24, 2020. (Ex. B to D.E. 224.) Because this Court may make a non-binding recommendation to the BOP at any time, *see United States v. Ceballos*, 671 F.3d at 856 n.2, it recommends that Defendant be reconsidered for home confinement given his exemplary record during incarceration and demonstrated commitment to rehabilitation.[12]

Defendant began his incarceration in October 2009 at Federal Correctional Institution ("FCI") Ray Brook in Ray Brook, New York, where he remained for approximately four years.

---

[12] The Government does not dispute any aspect of Defendant's academic or professional post-incarceration record as stated in his motion for compassionate release. (*See generally* D.E. 224.) Nor does it contest that Defendant has no disciplinary record since entering the BOP's custody. (*See id.*)

(D.E. 223 at 18.)  While at FCI Ray Brook, Defendant dedicated significant time to educating both himself and others.  For example, he tutored fellow inmates to help them obtain their high school equivalency diplomas, and personally completed nearly 500 hours of educational and vocational courses offered by the BOP, including 255 hours towards a drug and alcohol counseling certification course.  (*Id.*)  In addition, Defendant continues to work towards achieving a Bachelor of Science degree through courses offered by California Coast University.  (*Id.* at 18–19.)

On a professional level, Defendant was chosen to participate in a correctional employment program called UNICOR at FCI Ray Brook and at a subsequent facility, FCI Ashland, in Ashland, Kentucky.[13]  (*Id.*)  Defendant completed over 3,500 hours in the UNICOR program, where inmates made gear for the United States military and furniture for government agencies.  (*Id.* at 18 (citing App. at 153).)  While incarcerated at FCI Ashland, Defendant held the position of quality clerk in UNICOR, which he maintained for eight years.  (*See id.* (noting that Defendant "developed a talent and passion for quality control"); D.E. 225 at 2 n.2.)  In this role, Defendant answered customer complaints, integrated inventory management software with Microsoft Excel, and prepared software "systems for ISO surveillance and certification audits."  (D.E. 223 at 18; D.E. 225 at 2 n.2.)  Defendant also exhibited professional leadership by, for example, leading over a dozen men and assisting in the procurement of a lucrative government contract.  (D.E. 223 at 18.)  In 2016, Defendant was chosen as FCI Ashland's inmate recipient of an educational scholarship offered through UNICOR.  (*Id.* (citing App. at 137).)  Upon UNICOR's closure at FCI Ashland, Defendant was selected as a "highly-skilled" UNICOR participant eligible for transfer to another BOP facility.  (*See id.* (citing App. at 138).)

---

[13] UNICOR is the trade name for Federal Prison Industries.  BOP, UNICOR (Feb. 22, 2021, 9:00 A.M.), https://www.bop.gov/inmates/custody_and_care/unicor_about.jsp. There are approximately 25,000 inmates awaiting work in the UNICOR program, and only 8% of inmates who are work-eligible ultimately participate.  *Id.*

Significantly, in October of 2019, Defendant physically transported himself from Kentucky to USP Lewisburg in Pennsylvania by Greyhound bus and taxicabs over the course of 19 hours. (D.E. 223 at 19.) Although Defendant is housed at USP Lewisburg, his UNICOR assignment is at a nearby facility, FCI Allenwood. (*Id.*) Thus, before the UNICOR facility closed due to the COVID-19 pandemic, Defendant traveled twenty minutes by car between USP Lewisburg and FCI Allenwood with any licensed individual, including staff and minimum-security inmates. (*Id.*; D.E. 225 at 2.) Defendant typically worked between eight to thirteen hours a day, which often included overtime. (D.E. 223 at 19.)

Overall, Defendant's commitment to the academic success of his fellow inmates, his personal studies, and his professional growth reflect substantial rehabilitation over the last 148 months. Defendant is incarcerated at a minimum-security facility without any disciplinary history. (D.E. 223 at 19 (citing App. at 152).) Notwithstanding Defendant's abscondment before trial, he has been trusted to travel across state borders and commute to an off-site work location on a routine basis without issues. *See United States v. Campbell*, Crim. No. 03-4020, 2020 WL 3491569, at *7, *11 (N.D. Iowa June 26, 2020) (recommending home confinement where a minimum-security defendant had over a dozen unsupervised furloughs and traveled to work off-site five days a week without supervision). Although Defendant's criminal history encompassed acts of violence and was considered by this Court in imposing sentence, the present offenses for which Defendant is incarcerated deal with non-violent acts, namely, drug trafficking and bail fleeing. Indeed, in choosing to enhance Defendant's criminal history offense level by two points, this Court emphasized (i) the need for an appropriate repercussion due to the fact that Defendant never served jail time for his prior convictions; (ii) the government resources expended to locate Defendant after he fled this jurisdiction; and (iii) the government resources expended to relocate a witness who

13

became the target of an alleged murder plot in which Defendant participated. (Sent. Tr. at 67:16–25; 68:18–24.) After serving more than 84% of his sentence with a commendable record, it appears that Defendant's likelihood of recidivism is very low notwithstanding this Court's prior concerns at sentencing.

In addition, Defendant has a release plan, which includes residency in New Jersey at his older sister's home where she has lived for 24 years. (D.E. 223 at 20.) Defendant's intended residence currently houses three individuals: Defendant's mother, sister, and her fifteen-year-old son. (*Id.*) This re-entry plan appears to present a lower risk of possible COVID-19 recontraction than Defendant's current BOP facility.[14] Defendant also submits that he spoke with an individual who is prepared to offer him employment in an adult and youth mentoring business that Defendant helped to develop. (*Id.*) Moreover, because Defendant will be eligible for home confinement under 18 U.S.C. § 3624(c)(2) in September 2022 (D.E. 223 at 17 (citing App. at 146)), Defendant's maximum possible benefit under the CARES Act is 19 additional months of home confinement.

Accordingly, for the reasons stated above, this Court recommends that the BOP reconsider Defendant for home confinement. *See United States v. Ball*, Crim. No. 14-20117, 2020 WL 4816197, at *7 (E.D. Mich. Aug. 19, 2020) (recommending that the BOP carefully consider placing defendant in a community setting as soon as practicable); *Campbell*, 2020 WL 3491569, at *11; *United States v. Jones*, Crim. No. 17-070, 2020 WL 1814616, at *1 (N.D. Cal. Apr. 10, 2020) (denying motion for compassionate release but recommending home confinement).

## IV.   CONCLUSION

Defendant's Motion for Compassionate Release is **DENIED** without prejudice. However,

---

[14] It appears that USP Lewisburg experienced a COVID-19 outbreak that is subsiding, albeit slowly. (*Compare* D.E. 223 at 9–10 (noting 55 active inmate cases as of January 5, 2021), *with* BOP, COVID-19 (Feb. 22, 2021, 12:00 P.M.), https://www.bop.gov/coronavirus (reflecting 45 active inmate cases as of February 22, 2021).)

for the reasons stated above, this Court recommends that Defendant be reconsidered for home confinement by the BOP.  An appropriate order follows.

/s/ Susan D. Wigenton
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:     Clerk
cc:       Parties